

1    # DO NOT PUBLISH

2

3    The following constitutes
     the order of the court. Signed October 4, 2012

4

5

6    _William J. Lafferty, III_
     **William J. Lafferty, III**

7    **U.S. Bankruptcy Judge**

8    ## UNITED STATES BANKRUPTCY COURT

9    ## NORTHERN DISTRICT OF CALIFORNIA

10   ### OAKLAND DIVISION

11

12   In re:
     PW Commercial Construction Company, Inc.,          Case No. 07-40608

13                                                       Chapter 7

14                              Debtor.

15   **MEMORANDUM DECISION AFTER TRIAL ON OBJECTION TO CLAIM**

16           This matter came for hearing on June 4, 5 and 6, 2012, on the Objection of Eric Au and Edwin

17   Law (collectively, "Objectors") to the Proof of Claim filed by Chateau de Louis LLC, No. Nine, LLC,

18   and Real Enterprises, LLC (collectively, "Claimants") in the above-captioned case *In re PW*

19   *Commercial Construction Company Inc*.  As will be set forth at greater length below, Claimants assert

20   a claim against the debtor based upon theories of successor liability and alter ego.  After conclusion of

21   the presentation of evidence during the trial, the Court held an additional telephonic hearing on June 18,

22   2012 to resolve certain objections raised by Objectors to the introduction of certain exhibits by

23   Claimants, and another telephonic hearing on June 27 to resolve issues related to the use of written

24   transcripts of the examination of witnesses in August 2006 pursuant to an Order for Examination

25   obtained after judgment by Claimants in a state court proceeding.  The Court set a deadline of July 6,

26   2012 for the submission of post-trial briefs by the Objectors and the Claimants.  The parties timely filed

27   their post-trial briefs and the matter was then submitted for decision.

28           Having reviewed and considered the evidence presented during the trial of this matter, as well

United States Bankruptcy Court
Northern District of California

as the post-trial briefs and other submissions of the parties, the Court hereby OVERRULES the Objection, for the reasons set forth below. The Court will enter a separate Order disposing of the Objection.

## INTRODUCTION

Claimants, holders of a state court Judgment in the approximate amount of $1.8 Million against Pinewave Construction, Inc. ("PWC") following an arbitration of disputes concerning the construction of a condominium and commercial real estate project in San Francisco, timely filed a proof to claim (Claim No. 20-1; hereafter, the "Claim") against PW Commercial Construction Inc. ("PWCCI"), asserting that PWCCI is also liable on the debt based on successor liability and alter ego theories. Objectors, former shareholders in PWCCI, and successors to the rights of the Trustee in PWCCI to object to the Claim by the terms of a Settlement Agreement approved by this Court on June 2, 2010 [Docket #241], filed the Objection disputing that PWCCI is either the successor to PWC, or is an alter ego of PWC, and thus liable for PWC's debts.

For the reasons set forth below, the Court finds and determines that PWCCI is the successor to PWC for the purpose of imposing liability against PWCCI on account of debts owing by PWC, because (a) PWCCI is a "mere continuation" of PWC, and (b) the transfer of assets from PWC to PWCCI constituted a fraud on creditors of PWC, including Claimants.

Although the Court's ruling on the successor liability issue would fully resolve the dispute between the parties, for the reasons set forth below the Court also finds and determines that PWCCI is the alter ego of PWC, and thus liable for the debt owed by PWC.

Based thereon, the Court overrules the Objection, and the Claim is deemed allowed.

## I.  FACTS

### A.      Creation of PWC.

PWC was formed as a California corporation in 1989, for the purpose of managing construction projects and acting as a general contractor on certain such projects. The original shareholders of PWC included Edwin Law, Eric Au, Gavin Lam and Lawrence Lee. Eric Au testified that he transferred ownership of his shares in PWC to his wife and brother sometime in

2

2002, but was unable to remember exactly when the transfer occurred, or any of the details of the transaction, including the purchase price, or whether there were any conditions imposed on the transfer (i.e., conditions re control of voting rights or management in PWC). Although other witnesses offered by the Objectors also testified, conclusorily, to the fact of the transfer of Au's shares, none of those witnesses were able to provide any evidence to confirm the occurrence of the transfer, or to demonstrate the terms of the transfer. Adding additional uncertainty about Mr. Au's transfer of his shares, Claimants introduced into evidence a copy of the brochure created by the Pinewave entities and used in the marketing for the companies throughout at least 2005 that continued to list Mr. Au as a "principal" of PWC. (Exh. 8).

The directors of PWC during the period 2003-2005 were Law, Lam and Lee. Mr. Lee also testified that although Mr. Au had been a director of PWC at some point in time, he ceased being a director at about the time of the sale of his shares (although there was a lack of clarity as to the "start" and "end" dates of Au's tenure as a director). Mr. Lee was the President of PWC from its inception to the present. Despite testimony from the Objectors that Au was not involved in the management or operations of PWC after the sale of his shares, it appears from a number of documents that Mr. Au both was active in the business of PWC, and held himself out to the public as someone involved in PWC management and operations. For example, as will be discussed in greater detail below, during the period relevant to this dispute (2003-2005) Mr. Au appears to have executed a number of documents as the "Executive Vice-President" of PWC, and had a business card identifying him as PWC's Executive Vice-President. (Exh. 152).

Mr. Law was also an employee of PWC from at least February 2004 forward. Although it was not clear what title he held, Mr. Law testified that he was responsible for marketing the company, including creating and maintaining firm brochures and the website, as well as certain "legal" matters.

**B.      The Pinewave Entities**.

PWC, and, later, PWCCI, were part of a family of related companies, each of which, other than PWCCI, shared the full name "Pinewave" in their titles, and each of which, including PWCCI,

3

shared a common "logo".  (Exhs. 8 & 64).[1]  Each of the Pinewave entities, including PWCCI, performed tasks related to the construction business during the period 2004 through 2007.  Pinewave International acted as the parent company for all of the other Pinewave entities.  Pinewave Design and Engineering designed projects and performed structural and civil engineering services for construction projects.  The companies also clearly marketed their services in a combined fashion, sharing the content of a website (Exhs. 39 & 40), the trade-name Pinewave, or the strikingly similar "PW"[2] and offices in Northern California, at 3515 Ryder Street, Santa Clara, CA (the "Santa Clara Office") and in Southern California, at 21017 Commerce Point Drive, Walnut, CA (the "Walnut Office"), in order to create the impression of a unified group of companies that could provide competent and comprehensive service to customers seeking to plan and build substantial construction projects.  In addition, the Pinewave entities created a brochure, which they used as a marketing tool for all of the entities, and which boasted of repeat "shared" clients, and the companies' ability to manage projects for their clients "cradle to grave".  (Exh. 8).  Mr. Law also testified to the "comprehensive team management" that the Pinewave entities utilized, seeking to hire the best people available in the construction design, engineering, and project management areas in order to attract potential customers with their comprehensive approach to commercial construction projects.

In the years between 1989 and 2004 PWC completed many construction projects in California.  Most of these projects were "commercial": shopping centers, schools, warehouses, food manufacturing buildings, banks, office buildings; a few projects were "residential": apartment houses, condominium projects.  Mr. Law testified that, to his knowledge, PWC never worked on a single family home project.

[1]Mr. Au testified that although the logos appeared identical when depicted in black and white in the exhibits, he recalled that the logos were different colors.

[2]In what was merely one of a series of less than credible assertions, Edwin Law and Eric Au each testified that the name "PW Commercial Construction Inc." which they chose for the construction management company they formed (with others) in January 2004, was completely unrelated to the name "Pinewave", and that any similarity in the names was, at most, pure coincidence.

4

According to data presented in the report (the "Harry Report") of Claimants' expert Everett Harry (Exh. 150) during the period November 2004 through September 2005, the revenues to PWC from construction projects in which PWC acted as project manager or general contractor totaled approximately $14.5M; gross profits (i.e., revenues minus cost of goods sold, but prior to deducting other expenses) on those jobs were in excess of $900,000. (*Id.* at Attachment "C"). After deducting overhead expenses incurred during the same period by PWC and, per Mr. Harry, PWCCI, of approximately $1.095 Million, PWC experienced a net loss of approximately $195,000 for that period. *Id.*

## C. The Dispute Between PWC and Claimants.

In early 2002, Seth Samuels, a principal at Chateau De Louis LLC, began planning three related mixed-use residential (condominiums) and commercial real estate (retail stores and parking) projects to be built on Noriega Avenue in San Francisco (collectively, the "Noriega Project"). In the course of alerting the neighbors of the proposed site of his intentions to seek planning approval for the project, Mr. Samuels met Lawrence Lee, President of PWC. Mr. Lee informed Mr. Samuels of his connections at PWC, and related companies (Pinewave Design), and provided Mr. Samuels with materials touting the Pinewave entities' prior experience in substantial real estate construction projects throughout California, and its qualifications to assist in Mr. Samuels' proposed project. Mr. Samuels testified that he reviewed a brochure for the Pinewave entities (Exh. 8), as well as the company's website, and had numerous discussions with Mr. Lee before deciding to award the project to PWC. Mr. Samuels testified that he was favorably impressed with the number of projects completed by the Pinewave entities as set forth in the brochure, as well as the "integrated/full service" nature of the entities. Mr. Samuels also testified that Mr. Lee introduced him to Eric Au as another principal of PWC who would be involved with the Noriega Project.

Construction on the Noriega Project commenced in September 2002, and continued until December 2003, when, after inspection, Claimants notified PWC of certain structural problems with the project, i.e., that the floors on the upper levels of the building "bounced". Commencing in December 2003 and continuing into January 2004, PWC attempted to solve this problem by

5

reinforcing the joists supporting the upper level floors. These measures apparently did not correct the problem. In addition, Claimants contend that the Noriega Project remained unfinished as of January 2004 (e.g., no doors installed). By contrast, Objectors note that a Certificate of Occupancy was issued for the Noriega Project on January 24, 2004. (Exh. EE). In any event, Claimants refused to pay PWC the outstanding retention balance on the Noriega Project, and PWC refused to do any more work on the project.

PWC filed a mechanic's lien on the Noriega Project in May 2004, and filed and served a demand for arbitration of disputes concerning the Noriega Project in June 2004. Claimants filed a counter-claim asserting various defects in construction and the unfinished state of the work in July 2004. (Exh. FF). Claimants contend that rather than proceed quickly to commence and conclude the arbitration, PWC employed various excuses to delay the proceedings for over a year. The parties' disputes were arbitrated in August 2005, resulting in an award in favor of Claimants in the approximate amount of $1.8M. The award was confirmed as a Judgment of the Superior Court on October 24, 2005. (Exh.1). Thereafter, Claimants obtained and served an Order for Examination ("OEX") on PWC, and deposed several of the principals of PWC, and others, in an effort to obtain information that might be useful in enforcing their Judgment against PWC.

Although Claimants levied upon a bank account of PWC, that effort yielded only $30,000 in proceeds, leaving the vast bulk of Claimants' Judgment against PWC unsatisfied.

### D. The Creation of PW Commercial Construction.

PWCCI was formed as a California corporation on January 2, 2004. The evidence with respect to the ownership and management of PWCCI was murky, and at times contradictory.

According to the testimony of Mr. Lee and Mr. Law, the original founders of PWCCI included Lee and Lam, but these individuals did not become registered shareholders of PWCCI. Law and Au were apparently each issued shares equal to fifty percent (50%) of the outstanding equity in PWCCI in March 2005. (Exh. B). In some fashion, the Objectors seem to believe (and Law specifically testified) that Au "replaced" Lam and Law "replaced" Lee as "investors" in PWCCI. No investor or shareholder ever paid, at any time, cash consideration for their equity

6

interests in PWCCI; Law and Au received their equity interests in PWCCI solely in exchange for their "sweat equity". Law and Au, the eventual shareholders of PWCCI, were at that time, or had previously been, shareholders in PWC.

According to the Statement of Information filed with the California Secretary of State's office on January 20, 2004, the original directors of PWCCI were Lam and Lee. (Exh. 15). In addition, the same document identified Lee as the Chief Executive Officer and Chief Financial Officer of PWCCI, and Lam as Secretary. Lee claimed to have disassociated himself from PWCCI from March 2004 forward, however he did not formally resign as President of PWCCI until a year later, March 2005. (Ex.19). Further, although Lee also claimed not to have participated in any board meetings after March 2004, Claimants introduced into evidence a copy of "Minutes of Special Meeting" of PWCCI held August 11, 2004, that Lee signed as a director of PWCCI. (Exh. 18). Claimants also introduced evidence that Lee was listed as an officer of PWCCI by the Contractors State License Board until October 27, 2005 (Exh. 133), and that a version of PWCCI's website during 2006 identified Lee as a "principal" of PWCCI (Exh. 40).

Mr. Law testified that he became employed by PWCCI in April 2004. He conceded during his testimony that he performed essentially the same duties at PWCCI as he had while at PWC, at the same base salary. Mr. Law also testified that from November 2004 until September 2005, PWC actually paid the salaries of Mr. Law and all other then-current employees of PWC, while they were working extensively on PWCCI projects.

As also set forth in the Harry Report, and as was confirmed by the testimony of Au and Law, PWCCI first booked revenue on construction projects in November 2004. For the period November 2004 until the beginning of September 2005 (when PWCCI apparently first paid wages to employees and began to pay its own overheard expenses), PWCCI recorded approximately $3.9M in total revenue, against cost of goods sold of approximately $3.575M, and only $84,600 in expenses, for a total profit, for that period, of approximately $238,000. Harry Report, Attachment "D".

Objectors have offered various reasons and motivations for the creation of PWCCI. Lee testified that he, Au and Lam had discussed creating a new company at least six months prior to the

7

company's formation, and that the primary reason for creating PWCCI was to have a company that would work exclusively on commercial construction projects and avoid non-commercial projects, which created additional risks, including litigation risks. However, when questioned on cross-examination, Lee was unable to identify any other litigation claims that had arisen against PWC that might support the concerns raised, other than the disputes with Claimants concerning the Noriega Project.

Law testified that the management of PWC believed that it was necessary to form a new company to pursue commercial real estate projects because it would be impossible for PWC to obtain performance or payment bonds for new jobs in light of the large unsatisfied judgment in favor of Claimants (i.e., any potential bonding company would be concerned that the judgment creditor would immediately seize any funds coming into the company, rendering the company financially and operationally unviable). Law also testified at trial that there was no connection between the disputes between Claimants and PWC concerning the Noriega Project on the one hand, and the "wind-down" of PWC, and concurrent creation of and "ramp-up" of PWCCI on the other. However, and of critical importance to this matter, Claimants introduced testimony from Mr. Law's examination in August 2006 (much closer in time to the events in question) pursuant to the OEX, that specifically acknowledged that Lee told Law, and Law acknowledged, that problems with the Noriega Project contributed to the decision to wind-down PWC's operations. See, Transcript of Examination of Edwin Law, pursuant to Order of Examination at page 38, line 19 et seq.[3]

---

[3]During the June 27 post-trial telephonic hearing, the Claimants and the Objectors disagreed as to whether the Court could consider only those portions of the transcripts from the examinations taken pursuant to the OEX obtained by Claimants actually read into the record at trial, or whether the Court could also consider testimony in the same "area" as the testimony read into the record, to provide context to the Court, as necessary, in evaluating that testimony. The Court resolved this dispute by stating that it believed it would be appropriate to consider additional testimony, on a limited basis, purely for "contextual assistance", but that, if the Court were to consider such additional testimony for such purposes, the Court would specifically inform Objectors of each such instance in which the Court reviewed a portion of the Transcript not read into the record, and the exact extent of any such additional testimony considered. In observance of that ruling, the Court hereby informs the Objectors and the Claimants that the Court did not find it necessary to review any such additional testimony, and did not do so.

8

**E. Wind-Down by PWC and Transactions Between PWC and PWCCI.**

Claimants assert, and Objectors do not dispute, that PWC "wound down" its operations in late 2004, and essentially ceased operations in October 2005.[4] The parties also agree that PWC does not currently have any ongoing operations, nor any phone or fax numbers or any website. Apparently, PWC currently generates no revenue. The Court's research on-line indicates that PWC's current status with the California Secretary of State's Office is "suspended". Objectors nonetheless assert that PWC has not dissolved, and has at least one asset, an interest in a construction company located in China, obtained in exchange for an investment of $65,000. Claimants point out that Objectors have offered virtually no evidence of the existence of this investment or the company in which the funds were invested, and the parties seem to agree that, in any event, the "asset" in China has not, and is not likely to, provide any payments to Claimants on account of their Judgment.

The parties agree that PWCCI purchased certain office equipment from PWC in August and October 2005 for the total amount of $23,800, and a Toyota Tacoma truck for $21,000. (Exhs. D and E). In addition, PWC sold its one item of construction equipment, a "Bobcat" to a third party, Julio Mejia Construction, in October 2005 for $11,000. (Exh. C). The parties also agree that these items were transferred for fair value, for an aggregate total of $55,800.

The parties disagree, sharply, concerning whether other, intangible, assets of PWC were transferred to PWCCI. Although Claimants acknowledge that the only assets transferred from PWC to PWCCI via a documented sale are the items of equipment referenced above, Claimants maintain that the simultaneously orchestrated "wind-down" of PWC's business and "ramp-up" of PWCCI's almost identical business constituted a wholesale transfer of the assets of PWC to PWCCI by the

---

[4]Lawrence Lee testified, in opposition to Claimants' assertion that PWCCI took for itself projects or opportunities for projects that were either the property of PWC, or that were at least available to PWC, that PWC was working on, and continuing to obtain, numerous projects during 2004 and 2005. However, neither Mr. Lee nor any other witness corroborated such testimony with copies of the contracts reflecting such projects. Nor could Mr. Lee answer the simple question why, if PWC were indeed so busy during 2004-2005, it permitted virtually all of its employees to work on numerous PWCCI projects.

9

four individuals involved with both companies, Messrs. Law, Au, Lee and Lam.

For clarity of analysis, the factual issues raised by this dispute may be placed into three groups: (a) whether numerous "intangible assets" of PWC (not including rights under contracts or business opportunities) were effectively transferred from PWC to PWCCI via PWC's relinquishment of these assets as a consequence of its wind-down, and PWCCI's subsequent use of these assets; (b) whether PWC effectively financed the first ten months of PWCCI's operations by (1) paying certain overhead expenses that logically were attributable to, and therefore should have been allocated to, PWCCI, and (2) paying the salaries of employees who were PWC employees working on PWCCI projects, and (c) whether specific projects or opportunities to acquire and complete projects in which PWC had done at least some work, and which PWCCI completed as the contracting party, constituted a transfer of assets from PWC to PWCCI.

**1.     Transfer of intangible assets from PWC to PWCCI**.

Claimants presented substantial evidence in support of their assertion that PWCCI obtained valuable intangible assets of PWC, including:

– PWC and PWCCI shared the Santa Clara Office and the Walnut Office from January 2004 until November 2005;

– PWC and PWCCI shared the same telephone numbers (office and facsimile) from January 2004 until November 2005;

– PWCCI utilized the "group" website for Pinewave entities, including PWC, from and after November 2004;

– PWCCI utilized the common logo of the Pinewave entities, including PWC;

– Many PWC employees became employees of PWCCI as of September 2005; and

– The name of the new entity ("PW Commercial Construction Inc.") was obviously derivative of "Pinewave", and meant to exploit a perception of similarity of the entities and continuity of operations (although, as mentioned previously, Au and Law each testified that any resemblance between the names was purely coincidental).

In summary, Claimants argued that PWCCI essentially utilized for itself all of the intangible

10

assets of PWC, thereby acquiring also its goodwill in the marketplace. To this same point, Claimants also introduced into evidence a copy of the brochure for the Pinewave entities that included information concerning the prior experience of PWCCI as a construction manager, that listed several projects completed by *PWC,* not PWCCI. (Exh. 8).

In support of its argument that these intangible assets must have had value, Claimants relied upon the expert testimony of Mr. Harry, a licensed CPA with significant experience in the areas of government contracts and the construction industry. Mr. Harry performed an analysis of certain financial and other records of PWC and PWCCI, and prepared the Harry Report summarizing his analysis and conclusions. Mr. Harry was qualified as an expert, and testified during the first day of trial.

Mr. Harry testified that, using the "excess income" business valuation method, he concluded that PWC had assets of value in addition to the hard assets transferred to PWCCI and Mejia Construction. In summary, Mr. Harry's analysis attempts to determine the value of the intangible assets of PWC by (a) valuing the tangible assets of PWC (here $55,800, as agreed by the parties), (b) ascribing a reasonable rate of return to those assets (here estimated at 22%), and then (c) deriving a value for the income generated by those assets (here $12,276 ($55,800 x .22)). See, Harry Report, Attachment "L". Theoretically, if the subject company has income in excess of the income attributed to the hard assets, then one would logically attribute that income to intangible assets, or the "goodwill" of the subject company. After review of PWC's records, Harry asserted that the average yearly income (profit) for PWC for the five years preceding its wind-down in 2005 was approximately $47,000, so the average yearly income attributable to non-tangible assets is approximately $35,000 ($47,000 - 12,276). *Id.* Were one to value the intangible assets using the same deemed rate of return (22%), one would derive a value of approximately $159,000 ($35,000 divided by .22 = $159,090.09)[5] for those assets.

---

[5]Claimants attempted to have Mr. Harry testify as to the value of the intangible assets transferred from PWC to PWCCI, based upon the excess income analysis set forth in the Harry Report. Objectors objected to this testimony based upon the fact that the Harry Report did not contain any such conclusion

11

In opposition to Mr. Harry's testimony and the Harry Report, Objectors offered the testimony of Edward Huhn, also a licensed CPA with significant experience in the construction industry. Mr. Huhn was qualified as an expert and testified during the second day of trial. Mr. Huhn also produced an expert report (the "Huhn Report") which took issue with the conclusions offered in the Harry Report. Most pertinently for this aspect of the analysis, Mr. Huhn opined that the excess income method was not a reliable method of valuing a business such as PWC, because PWC did not have hard, fixed assets of a significant value. Mr. Huhn further stated that the excess income method was not useful in valuing PWC because the main "intangible" asset of PWC was its work-force, in place, an asset that should not be valued in the same manner as, for example, a trade-name.

### 2. PWC's Financing of PWCCI's First Ten Months of Operations

Mr. Harry also testified that he reviewed copies of PWC's and PWCCI's "Quikbooks" reports to determine what the revenue and expenses of PWC and PWCCI were during the period November 2004 to September 2005 and to determine whether PWCCI had paid for the normal operating expenses of a construction management company during that time frame. Mr. Harry concluded that during that period PWCCI generated approximately $3.9M in total revenue, and incurred approximately $3.57 Million in cost of goods sold, but that its expenses did not include typical overhead items, such as rent, salaries or benefits of employees, insurance, etc., notwithstanding the fact that, for example, PWCCI listed its office as the same address as PWC's office. See, Harry Report, Attachments "D" and "F". By contrast, PWC, which was then in its "wind-down" mode, continued to pay for all such overhead expenses. Harry Report, Attachments "C" and "E". Mr. Harry testified that under "activity based accounting", it would be consistent with generally accepted accounting principles for the companies to ascribe to PWCCI a portion of the overhead expenses consistent with the level of PWCCI's business activities, and have that company

of the value of those assets. Although the Court sustained the objection at the time, it is also clear to the Court that it is possible for anyone to derive the value of the allegedly transferred intangible assets by the performance of a simple arithmetic calculation, based upon the method used by Mr. Harry, and the Court has done so.

12

pay those expenses. However, there was no evidence that any such expenses had been allocated to PWCCI, nor even that any inter-company account was set up to record such expenses; and no such expenses were actually paid by PWCCI. Mr. Harry concluded that the payment of these expenses by PWC, without later reimbursement, constituted another transfer from PWC to PWCCI.

On cross-examination, Mr. Harry admitted that he had not reviewed actual copies of payments from either PWC or PWCCI, but had simply relied on the Quikbooks files. However, nothing in the cross-examination indicated that the Quikbooks files on PWC and PWCCI would not accurately have reflected the transactions attributable to, or the financial condition of, either company.

In response to the argument that PWC paid the overhead expenses of PWCCI for the period November 2004 through August 2005, the Objectors asserted that PWCCI simply had no overhead expenses. For example, Law and Au each testified that, as the sole officers and shareholders of PWCCI, they worked either out of their homes, or out of trailers set up at construction work-sites, not out of the main office for PWC and PWCCI, and used their cell phones for company business; thus, PWCCI had no expense for "rent", or "phones". In response, Harry pointed out that, in his experience, it would be somewhere between anomalous to unthinkable for a company generating over $3.9M in total revenue in less than a year, as PWCCI did from November 2004 to September 2005, to incur no traditional overhead expenses whatsoever. Moreover, even if Law and Au did not regularly work in the PWC offices, it is clear that several other PWC employees, who were working extensively on PWCCI projects during this time, did work in these offices and PWCCI therefore received at least that benefit from PWC's payment of rent. Putting aside the issues of payment of insurance expense and salaries and benefits for employees, which were neither paid for by PWCCI nor satisfactorily explained by Objectors, it is difficult to conceive how PWCCI could have avoided having a main office and an office phone, particularly where the brochures and website address used to market the company listed such facilities prominently. In addition, Mr. Harry pointed out that Mr. Law had admitted, during his testimony in connection with the OEX, that PWCCI had used the Walnut Office. See, Reporter's Transcript of Trial, Vol. I, page 110, lines 8-10.

13

In response to the assertion that PWC essentially paid the salaries of employees (including Mr. Law) who were working largely, if not exclusively, on PWCCI projects during the period November 2004 through August 2005.[6] Mr. Huhn referred to tax returns filed by PWCCI for the calendar years 2004 and 2005 (among others) that he believes establish that not every employee of PWC eventually became an employee of PWCCI. See, Huhn Report Attachments "A" and "B". From the data included in these documents, Mr. Huhn derived a chart that purported to demonstrate which employees worked for, and were paid by, PWC and PWCCI during the period August, September and October 2005. See, Huhn Report at 5.

In the Court's view, Mr. Huhn's assertions are simply not responsive to the main argument presented by Claimants, that PWC essentially financed PWCCI's initial operations by paying the salaries of those employees working on PWCCI projects--an assertion that both Law and Au admitted during cross-examination. And even were Huhn correct that certain employees of PWC did not do work for PWCCI, and PWCCI hired additional employees at some point in time, that would not negate the factual proposition asserted by Harry, that during the critical formative months for PWCCI, 91% of the salaries paid by PWC related to employees of PWC who either worked on PWCCI projects, or became PWCCI employees.

Moreover, the Court's review of the chart produced by Mr. Huhn at page 5 of his Report indicates that twelve out of seventeen of the employees on the payroll at PWC during July and August 2005 (and twelve out of thirteen of the employees on the payroll during August 2005) became employees of, and were paid by, PWCCI from September 2005 forward. See, Huhn Report at 5. Although PWCCI may have added additional employees, it is incontrovertible that PWCCI acquired a very substantial portion of the work-force of PWC.

### 3. Projects Allegedly Diverted to PWCCI from PWC.

Claimants maintain that there are several projects that were completed by PWCCI and for which PWCCI received the revenue, which were either begun by PWC, or represented business

---

[6]An assertion supported by Mr. Harry's Report. See, Harry Report, Attachments "J", "J-1", "J-2".

14

opportunities for PWC that were exploited by PWCCI. Briefly summarized, Claimants point to the following:

     – With respect to a project known as the "Wing Lung Project", which PWCCI claimed as its own project, (1) documents provided to Claimants pursuant to a Subpoena to the City of Alhambra dated February 29, 2012 (Exh. 124), including a Building Permit Application, Grading Permit, Electrical Permit Application, Plumbing Permit Application, and Mechanical Permit Application, each (a) identified PWC, not PWCCI, as the contracting party, and were signed by Au as Executive Vice-President of PWC, (b) referred to PWC's contractor's license number, (c) referred to PWC's workers compensation insurer and policy number; and (2) Exh. 43, introduced by Claimants, is a collection of "Work Order Requests", dated as of 12/06/2004 and 4/15/2005 transmitted by PWC (not PWCCI) to the counter-party;

     – With respect to a project known as the "South Street Project", which PWCCI claimed as its own project, Claimants introduced a document entitled "Construction Cost Estimate, etc." dated April 15, 2005, that references PWC's contractor's license number, and identifies Au as the "Principal Operator" in his capacity as Executive Vice-President of PWC (Exh. 77);

     – With respect to a project known as the "Sing Tao Newspaper", which PWCCI claimed as its own project, documents provided to Claimants pursuant to a Subpoena to the County of Los Angeles Department of Public Works dated February 29, 2012 (Exh. 129), including  Building Permits, Electrical Permits, Plumbing Permits, and Mechanical Permits, each (a) identified PWC, not PWCCI, as the contracting party, and identified the applicant as either Au, or PWC employee David Lau, (b) referred to PWC's contractor's license number, (c) referred to PWC's workers compensation insurer and policy number documents;

     – With respect to a project known as the "Ulferts Center Dublin", which PWCCI claimed as its own project, Claimants introduced a copy of the "Permit Application Worksheet to City of Dublin" dated November 2, 2004, that (a) identified PWC, not PWCCI, as the contracting party,  (b) referred to PWC's contractor's license number, (c) referred to PWC's workers compensation insurer and policy number (Exh. 66); Claimants also introduced a copy of PWC's "Account QuickReport

15

printout for Pinewave Construction, Inc., etc." referring to a check issued by PWC to the City of Dublin for "Plan Check Fee" for Ulferts Center (USA) (Exh. 67);

    – With respect to a project known as "Gold Touch", a project located on Monterey Road in San Jose, California, which PWCCI claimed as its own project, Claimants introduced a copy of the "Construction Cost Breakdown" dated March 5, 2005 (Exh. 109, sub-part "C") that (a) was signed of by Lawrence Lee as the "President" of an unidentified company, provided, however, that it was Objectors' testimony that Mr. Lee was the President of PWC at all times relevant to this dispute, but was not actively involved in the management or operations of PWCCI from and after March 2004, and (b) referred to PWC's contractor's license number.

**F.**      **PWC's Bankruptcy**.

PWCCI's financial condition deteriorated during the latter part of 2006, and the company filed a voluntary petition under chapter 11 of the Bankruptcy Code on February 28, 2007. The case was converted to one under chapter 7 by Order entered December 5, 2007. John Kendall was appointed trustee, and continues to serve in that role as of today.

## II. ANALYSIS

After review of the documentary and testimonial evidence presented, as well as review of the governing authorities, the Court has little difficulty concluding that PWCCI was both the successor to PWC, and an alter ego of PWC.

**A.**      **Burden of Proof**

The trial briefs filed by the parties did not address directly which party had the burden of proof with respect to this Objection. For this reason, and because the Court was concerned that neither parties' counsel were experienced bankruptcy attorneys, the Court noted the issue at the beginning of the trial and asked the parties to address the issue in their post-trial Briefs. In the end, the issue was not particularly controversial. As the parties each acknowledged, a filed Proof of Claim is *prima facie* valid. Federal Rule of Bankruptcy Procedure 3001(f). However, once a party in interest files an objection demonstrating some ground for disallowance, the burden shifts back to the claimant to demonstrate, by a preponderance of the evidence, the validity of the claim. *In re*

16

*Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992); *In re Murgillo*, 176 B.R. 524, 529 (B.A.P. 9th Cir. 1994).

Claimants timely filed their Claim on April 4, 2008. Thereafter, Objectors filed their objection, asserting that the Claim is not enforceable against PWCCI because it is a separate entity from PWC. In response, the Claimants have argued that the Claim is enforceable against PWCCI because (a) PWCCI is a successor to PWC, and thus should be liable for the debts of PWC, and (b) PWCCI is the alter ego of PWC. For the reasons set forth herein, the Court determines that the burden of proof is on Claimants, and that they have satisfactorily demonstrated their entitlement to assert the Claim against PWCCI.

**B.     PWCCI Is the Successor to PWC Under California Law, and Thus Liable for Claims Against PWC.**

Under California law, a company that acquires the assets, but not the equity interests, of another company does not become liable for the debts of the company from which the assets were acquired <u>unless</u>: (a) there is an express or implied agreement to have the purchaser assume and be liable for the debts of the company whose assets it acquired; (b) the transaction between the acquirer and the company whose assets were acquired amounts to a consolidation or *de facto* merger of the two companies; (c) the acquiring company is the "mere continuation" of the company whose assets were being acquired; or (d) the transaction is entered into for the fraudulent purpose of escaping liability for the seller's debts. *Ray v. Alad Corp.*, 19 Cal.3d 22, 28 (Cal. 1977)[7].

Claimants focus on the "mere continuation" and "fraud on creditors" exceptions to the general rule of non-liability. I find that there are sufficient facts to establish liability for PWCCI on either theory.

_____

[7]Although both parties cite *Ray v. Alad* as the seminal case in this area, strict reliance on *Ray v. Alad* would be misplaced: although the case correctly states the general rules governing successor liability in California, the holding in the case expands the general rule to dispose of an issue arising under the law of strict tort liability in California. Thus, much of the discussion in *Ray* concerning the correct rules to apply in a strict liability tort context is inapposite to this case, in which the liability arise under contract. As demonstrated herein, however, the rules concerning successor liability that are set forth in the text above accurately state the law in this state, significantly pre-date *Ray v. Alad*, and are clearly applicable to issues raised by liability under contract.

17

### 1. PWCCI is the "mere continuation" of PWC.

As an initial matter, Objectors assert that in order to recover under the "mere continuation" prong to the successor liability doctrine, Claimants must demonstrate that PWCCI acquired *all* of the assets of PWC, citing *Katzer's Floor & Home Design v. M-MLS.com*, 394 F.3d 1143 (9th Cir. 2004); *Butler v. Adoption Media, LLC*, 486 F.Supp.2d 1022 (N.D.Cal. 2007). Claimants disagree that there is any hard rule requiring the transfer of *all* assets of the transferor, citing to the language from the opinion in *Orthotec, LLC v. Reo Spineline, LLC*, 438 F.Supp.2d 1122, 1128-29 (C.D.Cal. 2006) ("[t]he exceptions to the general rule of successor nonliability apply only 'where all or substantially all of the corporations assets are purchased'"); *see also, Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1330 (9th Cir. 1975).

After consideration, the Court concludes that under California law the "mere continuation" prong of successor liability is satisfied where the principal assets, or all or substantially all of the transferor's assets, are transferred for less than fair value and that one or more persons were officers, directors or stockholders of both corporations. *Acheson*, 523 F.2d at 1330.

### a. PWCCI acquired substantially all of the assets of PWC for less than fair value.

Objectors argue that the only assets that PWC transferred to PWCCI were certain office equipment and a vehicle, and that PWCCI paid fair value for those assets.

Claimants asserted, and provided substantial evidence, that PWCCI acquired numerous intangible assets from PWC. Indeed, Objectors admitted during their testimony during trial (and in their testimony provided in connection with the OEX in August 2006) that for the period January 2004 through October 2005 PWCCI had the same Northern and Southern California office locations as PWC; that the office phone and fax numbers used by PWCCI were the same as those used by PWC; and that PWCCI essentially used the workforce of PWC during the period November 2004 through August 2005, when PWC paid the salaries of employees working on PWCCI projects. Mr. Law also admitted during trial that most PWC employees became PWCCI employees, doing the same jobs, for the same pay, as they had done at PWC, that PWCCI used the same website as PWC,

18

1 and that PWC used the trademark logo of the Pinewave entities.[8]

2 And although Objectors testified that any similarity between the names "Pinewave

3 Construction, Inc.," and "PW Commercial Construction, Inc." was purely coincidental, and was not

4 an attempt to market the new company on the reputation of the older company, that testimony was

5 simply not credible. In any event, that testimony was directly contradicted by the fact, also

6 acknowledged by the Objectors, that the website used by PWCCI in 2006 (Exh. 40) credited that

7 company with numerous projects that had actually been completed by PWC, and to which PWCCI

8 had no connection whatsoever.

9 It is thus abundantly clear to the Court that substantially all of the intangible assets of PWC,

10 constituting what one would correctly refer to as PWC's "goodwill", were effectively transferred

11 from PWC to PWCCI, for no value.

12 This conclusion is further bolstered by Mr. Harry's testimony and the contents of the Harry

13 Report, which set forth a credible method of valuing the intangible assets of PWC. The Court is

14 persuaded that PWC had intangible assets beyond the vehicle, office equipment and Bobcat

15 transferred by PWC, and that the value of such assets may be ascertained by use of the excess

16 income method, which simply seeks to find a value for those assets based upon historical, and

17 unchallenged, financial data for PWC.

18 Objectors asserted that Mr. Harry's use of the excess income method was inappropriate

19 because, first, that method is not useful unless one is seeking to value a business with substantial

20 hard assets. To the extent that argument would critique the particular value ascribed to intangible

21 assets, such as, for example, arguing that one might apply a different expected rate of return to the

22 company's assets, or even to its intangible assets, that argument, even if accepted, would not result

_____

24 [8]To the extent that it might be argued that the intangible assets referred to above were not
'transferred" from PWC to PWCCI because they were the "property" of the Pinewave entities generally,
or that they remained at least theoretically available for PWC's use, the Court notes that Objectors did
25 not make that argument. Moreover, for the reasons set forth herein (i.e., the discussion of *Kaminski v.
Western MacArthur Co.*, 175 Cal.App.3d 445 (Cal. App. 1985), *at pp. 22-23, infra*), the Court is amply
26 satisfied that the appropriation of intangible assets from a company engaged in a planned wind-down
by a newly formed company with significant ties to its predecessor, in the same industry, constitutes a
27 transfer of assets for successor liability purposes.

28
19

in a value of "zero" for the intangible assets of PWC. Objectors also argued that the excess income valuation method was an inappropriate valuation method where the transferor's primary intangible asset, as Objectors asserted here, was the company's work force; the argument seems to be that it is somewhere between invalid and unseemly to ascribe "value" to such an "asset". But, as Harry pointed out, the value of a skilled workforce, in place, is significant, and frequently represents a major portion of what it deemed "goodwill".

In addition, Claimants also provided significant evidence that PWCCI took the benefit of numerous construction jobs for which PWC had apparently performed services, or for which, absent PWC's self-imposed wind-down, and efforts to "steer" the work to PWCCI, PWC would have completed the work and received the revenue. As set forth at section (I.)(E.)(3.), *supra*, Claimants identified numerous instances in which PWC either obtained the initial building permit, or PWC's contractor's license and insurance were utilized to commence work on a project for which PWCCI, not PWC, was eventually listed as the contractor, and received the revenues. When confronted during cross-examination with the evidence of PWC's prior involvement on these projects, Law and Au each maintained that the contracts were PWCCI contracts, and not PWC contracts, and that any evidence of prior involvement by PWC simply reflected a "mistake" in filling out paperwork. In short, the Court found Objectors testimony on this issue lacked credibility, particularly in light of the number of instances in which PWC appears to have been involved in projects for which PWCCI took the benefit.

Objectors argued that since PWCCI was ultimately the contracting party on these jobs, and PWC was, at best, a party performing preliminary services, nothing of value was transferred from PWC to PWCCI. Typical of Objectors' approach to this issue was the evidence they offered with respect to the Ulferts Center (Dublin) job, completed by PWCCI in 2006. Objectors offered the testimony of Karen Kam, who was the Vice-President and Secretary of Ulferts Center, Dublin, Inc. Ms. Kam testified that she was aware of the project that PWC had completed for Ulferts Center (USA), Inc. in 1998, but stressed that there were several separate companies with the name "Ulferts": Ulferts Center (USA), Inc., Ulferts Center Dublin, Inc., and Ulferts Investment Group,

Case: 07-40608   Doc# 367   Filed: 10/04/12   Entered: 10/04/12 15:52:24   Page 20 of 34

USA, Inc. Ms. Kam's assertion of the separateness of these entities was undercut by her testimony

that she was also the Vice-President and Secretary of Ulferts Center (USA), Inc., and Ulferts

Investment Group, USA, Inc., the exact same positions she holds at Ulferts Center (Dublin), Inc.

Ms. Kam testified that she first met Mr. Law at a "networking" event for Chinese American

professionals in mid 2004, and that he gave her his business card at that time. Interestingly,

although Ms. Kam testified at trial that the card Mr. Law gave her indicated Law was employed by

"PWCCI", that testimony was impeached by Claimants' introduction of Ms. Kam's testimony at the

OEX in August 2006, considerably closer to the time of the subject incident, that she could not then

remember what entity's name was on Mr. Law's business card. Transcript of August 15, 2006

Examination of Karen Kam pursuant to OEX, page 16, lines 2-4.

When Ms. Kam determined that Ulferts Center Dublin needed help planning and

constructing their office building project, a couple months after meeting Mr. Law, she contacted Mr.

Law, and asked whether he would provide a bid. Mr. Law and PWCCI were offered the job, Ms.

Kam asserted, solely on the basis of these contacts and the bid received. Ms. Kam denied that she

was aware of any connection between PWC, the contractor on the Milpitas project, and PWCCI, or

that Mr. Law, in seeking to market the services of PWCCI, ever mentioned his prior connections

with PWC, or Mr. Lee. Ms. Kam also stated that she did no independent due diligence about

PWCCI or any of its affiliates, even though she acknowledged that Pinewave Design had also done

work for the Milpitas project.

Frankly, the Court had severe doubts about the credibility of this testimony. It simply made

no sense that Ms. Kam would fail to take into account, or even inquire about, a connection between

a company that had performed a major construction job for an affiliate of her company

approximately 8 years earlier, of which she was clearly aware, in deciding whether to award a

significant new piece of work to a brand new entity with a strikingly similar name. And it made

even less sense that Mr.Law would not have used Ulferts Center USA's prior experience with PWC

to market the services of PWCCI, especially in light of the fact that the brochure/website in use at

the time falsely claimed that PWCCI had performed projects actually done by PWC.

21

But, in truth, this matters little.  Whether PWCCI or PWC were the ultimate "contractor" on this job, the Court is convinced that PWCCI arranged to offer its services and not PWC's, to perform this contract.  Mr. Law admitted exactly this in his testimony, when he stated that he had not even informed Ms. Kam of the possibility that PWC, which had been the contracting party on the Milpitas project for Ulferts Center (USA), could perform the work on the Dublin project.  In light of this testimony, Objectors cannot credibly argue that Kam "chose" to do business with PWCCI rather than PWC–by their own testimony, she was never given a choice.  Further, it is impossible for the Court not to conclude that Law's "steering" of this project to PWCCI over PWC did not constitute transfer of an asset from PWC to PWCCI.  That he took this action while he was also an employee for PWC, and being paid exclusively by PWC, and after PWC had taken substantial  initial steps to commence work on the project, makes PWCCI's actions all the more egregious.

The Court also agrees with Claimants that the sort of intangible assets transferred here, business opportunities, projects already commenced, a trained workforce, use of an office, a common logo and website, represent the sort of assets that often can, and here, do, constitute substantially all of the assets of PWC.  *See, Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327, 1329-30 (9th Cir. 1975); *Kaminski v. Western MacArthur Co.*, 175 Cal.App.3d 445, 455-457 (Cal. App. 1985).

Indeed, the *Kaminski* decision appears particularly apt to the Court.  In that case, Western MacArthur Corporation argued that it was not the successor to Western Asbestos Co., claiming that it had not acquired the "principal assets" of Western Asbestos, or acquired a going concern.  *Id*. at 457.  In ruling for the plaintiff, the Court of Appeals noted that Western MacArthur had acquired from Western Asbestos inventory, goodwill, customer mailing lists and records, and substantially all of Western Asbestos' employees.  *Id.* at 452.  Moreover, the court noted that Western MacArthur assumed Western Asbestos' current contracts, and completed works in process, and actively sought out Western Asbestos' former clients to tout the new corporation as having the same experienced personnel and products and services as its predecessor.  *Id.*  In this way, Western MacArthur demonstrated not only that it had acquired substantially all of the assets of Western Asbestos, it also

22

made clear its intent fully to exploit the opportunities presented by its status as a successor to Western Asbestos.

The Court finds this behavior quite similar to that of PWCCI's principals. The Court finds that PWCCI obtained valuable assets from PWC (offices, website, logo), marketed itself as having performed projects actually performed by PWC to create a perception of continuity of experience, utilized PWC's workforce, and took for itself the benefits of jobs commenced by PWC.

And the Court of Appeals in *Kaminski* also rejected any claim that Western MacArthur could not be liable as a successor to Western Asbestos because it did not acquire a "going concern", i.e., that it could not have acquired anything of sufficient value based upon Western Asbestos' poor financial condition just prior to the transfers. Rather, the *Kaminski* Court concluded that although Western Asbestos experienced shortages of capital, it nonetheless retained assets critical to the continuing operation of the business in its acquirer's hands, i.e., experienced personnel, customer lists, reputation and goodwill, the receipt of which by Western MacArthur made it possible to continue the business. *Id.*

Finally, Objectors attempt to make much of the fact that although PWC currently is not operating, it has not dissolved, but continues in existence. Objectors refer to the case of *Butler v. Adoption Media, LLC*, 486 F.Supp.2d 1022 (N.D.Cal. 2007), for the proposition that, so long as PWC remains in existence, the "mere continuation" theory of successor liability may not be asserted against PWCCI as a matter of law.

The Court disagrees, and finds *Butler* readily distinguishable. As an initial matter, the court in *Butler* stated, somewhat conclusorily, that the transferor company in that case had not dissolved and therefor remained "legally viable"; for that reason, among others, the court declined to apply the "mere continuation" theory of successor liability. *Id.* at 1066. PWC, however, cannot claim the same status as the transferor in *Butler,* since it has been suspended by the California Secretary of State's Office, and is therefore currently ineligible to conduct business in this state. Cal. Corp. Code section 2205.

It is also clear that the court in *Butler* concluded that although some assets had been

23

transferred from one company to another, the transaction constituted "a continuation of [only] part of the enterprise of the [transferor]". *Butler,* 486 F.Supp.2d at 1066. As stated above, on the facts presented here, the Court has concluded that not only have substantially all of the assets of PWC been transferred to PWCCI, but PWCCI is carrying on essentially the same business as that carried on by PWC.

And more fundamentally, as a careful reading makes clear, cases that rely upon the continuing existence of the transferor company as a reason to deny liability against the transferee/successor under the mere continuation theory, including *Butler,* predicate that holding on the fact that the transferor is not only still in existence, but able to answer for its debts. *See, e.g., Butler,* 486 F.Supp.2d at 1064 (noting that the party disputing successor liability demonstrated that the transferor company "still exists and has assets, and could readily pay any judgment for the minimum statutory charges at issue in this litigation"[9]). While PWC is technically still in existence, it is uncontested that it cannot possibly satisfy any portion of Claimants' outstanding Claim, and thus the fact that it has not dissolved is irrelevant.

Under these circumstances, it makes no sense to allow PWC to hide behind the fiction that, having not formally dissolved, but having orchestrated a transfer of assets that left the transferor a shell without any ability to satisfy the just claims against it, it is "still in existence" and that the "mere continuation" ground for successor liability cannot be invoked as a matter of law. The Court will not countenance such an inequitable result.

### b. One or more persons were officers, directors or shareholders of PWC and PWCCI.

As discussed elsewhere herein in greater detail, one or more persons were officers, directors

---

[9]The quoted language highlights another aspect of the *Butler* decision that distinguishes it from the case at hand: the primary dispute in *Butler* centered not on the payment of "damages" or the statutory fine imposed for defendant/transferor's discriminatory conduct against the plaintiffs; that liability was minimal, as the quoted language makes clear. Rather, the real dispute in *Butler* centered on whether the court should issue an injunction against the transferee company, which had, admittedly, not directly engaged in any wrongful conduct, in its capacity as the alleged successor or alter ego of the alleged transferor. *Id.* at 1066-67.

24

or shareholders of PWC and PWCCI.

The shareholders of PWC were, initially, Lee, Law, Lam and Au. Although Au asserted that he had transferred his ownership interest in PWC prior to 2004, the Court notes that there was no documentary support for this assertion, and even Au could not remember even the most basic facts pertaining to the transfer. Accordingly, the Court found this testimony unreliable.

Per the trial testimony of Edwin Law, and also per the testimony he provided on August 15, 2006 in connection with the OEX (Transcript of Examination of E. Law at page 46, line 4 et seq.) the initial "investors" in PWCCI were Lee and Lam. Au and Law became shareholders by action of PWCCI taken March 15, 2005. (Exh. B). There is thus at least some overlap in equity ownership of PWC and PWCCI.

The directors of PWC during the relevant period were Lee, Lam and Law. The initial directors of PWCCI were Lee and Lam, later changed to Law and Au. There is thus also some overlap among the directors of PWC and PWCCI.

Lee was the President of PWC throughout these matters, and was the initial CEO and CFO of PWCCI; moreover, evidence was also presented that Lee functioned as the "President" of PWCCI well into 2005. Au was held out as an Executive Vice President of PWC throughout these matters; he later served as an officer of PWCCI.

Finally, it was also demonstrated through an examination of PWCCI's website as it appeared during 2006 that Lee and Au were each advertised, to the general public, as "principals" of PWCCI as it had also claimed for PWC, some years earlier.

The Court concludes that this requirement is satisfied.

### 2. The transactions between PWC and PWCCI were undertaken to escape liability for the debt to Claimants.

In order to succeed under the "fraud on creditors" theory, Claimants must demonstrate that PWCCI acquired the assets of PWC for the fraudulent purpose of escaping liability for the seller's debts. *Stanford Hotel Co. v. M. Schwind Co.*, 180 Cal. 348, 353 (Cal. 1919); *Higgins v. Cal. Petroleum & Asphalt Co.*, 122 Cal. 373, 376 (Cal. 1898).

25

The Court believes that the facts clearly support the proposition that PWCCI acquired the assets of PWC to avoid paying the obligation owing to Claimants.  Although Objectors attempt to paint a "time-line" that undermines any evidence or inference of fraud, the Court notes the following:

– PWC first learned of a potential complaint about the construction of the Noriega Project in December 2003, at least a month before PWCCI was formed;

– The nature of the complaint, i.e., that the upper floors on the projects were "bouncy", indicates that there was a substantial problem, and one that might not be easily remedied;

– Although PWC took some steps to rectify the initial problem, those steps were clearly insufficient, based upon Claimants' refusal to pay the amounts remaining due;

– As was set forth in Claimants' response to PWC's demand for arbitration, filed in July 2004, there were substantial additional problems with the construction of the Noriega Project;

– PWCCI claims first to have acquired a project (the Wing Lung Project) in August 2004, one month after receipt and notification of a potentially significant claim against PWC;

– The arbitrator's award in favor of Claimants was entered in August 2005, and confirmed by order of the Superior Court in October 2005;

– At virtually the same time (August/September 2005), PWC completed its wind-down, and PWCCI began hiring employees and paying overhead.

Further, the "rationales" offered by Objectors for the formation of PWCCI do not dispel or lessen the inference of fraud; rather they enhance that inference.

Lee testified  that Au and others had discussed at least six months prior to PWCCI's formation the prospect of forming a new company to focus exclusively on commercial construction projects, and thereby avoid the additional litigation risks and hassles posed by residential jobs. Based on this testimony, Objectors dispute the proposition that PWCCI was formed in response to the claims asserted by Claimants.  This statement is simply not credible, for at least two reasons. First, Lee admitted that he was unaware of any claims asserted or threatened against PWC, other than the claims by Chateau de Louis et al., that could have supported a view that "residential"

26

projects were inherently more troublesome or risky. There is no other basis in the evidence for that opinion. Secondly, even if Objectors had determined that residential jobs were "riskier", the fix for that problem was not to do any more residential jobs, a business plan which, by the way, was entirely consistent with PWC's then-current business practice and history of performing almost exclusively commercial projects. PWC and its management did not have to go to the trouble of forming a new company to "specialize" in commercial construction: they had one already, PWC. What made that company unattractive to them wasn't a flawed business plan, but an unfavorable balance sheet.

Moreover, the Court notes, purely for illustrative purposes (and not to suggest that the Uniform Fraudulent Transfer Act either law governs or supplies the rule of decision concerning this dispute) that a finding that this transaction was fraudulent as it pertains to PWC's creditors is consistent with the "badges of fraud" that California law directs courts to consider as indicia of actual intent to defraud creditors in connection with suits to recover fraudulent transfers pursuant to the provisions of California Civil Code Section 3439.04. As that statute provides:

> "(b) In determining actual intent [to defraud creditors], consideration may be given, among other factors, to any or all of the following:
>
> (1) Whether the transfer . . . was to an insider;
>
> (4) Whether before the transfer was made . . . the debtor had been threatened with suit;
>
> (5) Whether the transfer was of substantially all of the debtor's assets;
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ;
>
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made."

As the facts set forth above readily demonstrate, each of these factors is satisfied here. The transfers were to an entity that is clearly an insider of PWC, by virtue of common ownership and management; the transfers from PWC to PWCCI, in the form of PWCCI's using PWC assets, taking PWC business opportunities, and utilizing PWC's employees for free each occur from and after August 2004, shortly after Claimants' response to PWC's arbitration demand set forth a potentially

27

substantial claim against PWC; the Court has found that PWC did transfer substantially all of its assets to PWCCI; the Court has found that the consideration paid to PWC was inadequate; and the Court believes that PWC was insolvent on the date of the transfers (at least in the "liquidity" sense of lacking sufficient assets to pay debts as they came due, if not also the balance sheet test).

The other rationale offered by Objectors, Mr. Law's statement that it became necessary to form a new company because PWC would no longer be able to obtain performance or payment bonds for new projects, essentially admits that the purpose for creating PWCCI, and for directing PWC's business opportunities to it, was to avoid paying Claimants' claim. That Objectors may believe that their actions were not done with malicious intent, but were merely, in their minds, a fact of life in business, does not change the result. It is not necessary to prove "actual fraud" (intent to hinder delay or defraud) in order to prevail on a successor liability claim based on fraud on creditors; constructive fraud (less than fair value received, and creditor's claim cannot be satisfied) is sufficient. *Higgins,* 122 Cal. at 376.

For all of these reasons, the Court concludes that PWCCI is the successor to PWC for purposes of allowing Claimants to assert their Claim against PWCCI.

**C.     Alter Ego**

As an initial matter, the question whether to apply the alter ego doctrine in a disputed matter is governed by the relevant state law. *Enterprise Acquisition Partners, Inc*. 319 B.R. 626, 634 (9th Cir. BAP 2004). In order to prevail upon a theory that PWCCI was the *alter ego* of PWC under California law, Claimants must show "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts treated are those of the corporation alone, an inequitable result will follow." *Messler v. Bragg Management Co.,* 39 Cal.3d 290, 300 (Cal. 1985). Further, "only a difference in wording is used in stating the same concept where the entity sought to be held liable is another corporation instead of an individual." *Id.*

28

### 1. Unity or commonality of interest.

Objectors contend that Claimants cannot demonstrate that the requisite unity of interest existed between PWC and PWCCI so as to satisfy the first prong of the alter ego test, because, according to Objectors, California law requires *complete* unity of ownership interest between the party with the primary liability and the alleged alter ego. Thus, per the Objectors, since PWC's shareholders were Au's wife and brother, Law, Lee and Lam, and PWCCI's ultimate shareholders were Au and Law, the Court cannot find that PWC and PWCCI exhibited the requisite "unity of ownership". The Court disagrees.

First, as the cases make clear, the alter ego doctrine is founded in equity, and its application depends upon the facts of each case. *Las Palmas Assoc. v. Las Palmas Center Associates*, 235 Cal.App.3d 1220, 1248 (Cal. App. 1991). For this reason, there are no particular factors that form a "litmus tests" that must be satisfied before a court can find alter ego liability. *Baize v. Eastridge Companies*, 142 Cal.App.4th 293, 302 (Cal. App. 2006). And whatever the standard may be for the application of the doctrine between a corporation and its shareholder(s), this Court believes that it is abundantly clear under California law that alter ego liability may be found between "sister" corporations, and that such liability does not require a finding of absolute unity of ownership. See, e.g., *Las Palmas Assoc.*, 235 Cal.App.3d at 1248-1249 (alleged corporate alter ego could not escape liability based upon assertion that it had transferred its interest in the corporation primarily liable to another affiliate, prior to the incurrence of the subject obligation); *Baize,* 142 Cal.App.4th at 302-303 (commonality of interests sufficient).

In fact, even were this Court to apply the unity of interest test urged by Objectors, the Court could well find the test met on the facts presented. Respecting the ownership of PWC, it is undisputed that Lam, Lee and Law were shareholders of PWC during the time periods relevant to this dispute. Mr. Au, who had been a shareholder in PWC, alleges that he transferred his shares to his wife and his brother, but there was no evidence presented of any such transfers. The only "evidence" regarding the transfers is Mr. Au's unsubstantiated testimony; and Mr. Au was completely unable to supply any details of the transaction that would corroborate his testimony, such

29

as when the sale took place, how much was paid for the shares, etc.  Of course, even were the Court to take Mr. Au's testimony at face value, the Court notes that (a) a transfer to Mr. Au's wife would have been of little consequence if she held the shares as community property, an issue to which there was no evidence presented, and (b) a transfer to Mr. Au's brother may well be deemed merely a transfer to an insider.  In sum, the Court is inclined to discount Mr. Au's testimony about the true ownership of the PWC shares he had received.

Respecting ownership in PWCCI, the Objectors testified that while Lee and Lam were the original founders of PWCCI, only Law and Au ultimately became owners of issued shares; and they received their shares only on account of their work for the company, not on account of any cash consideration.  Apparently Mr. Lee, who had helped found PWCCI, and was an original "investor", either lost interest in the enterprise, or simply became uninvolved as Law and Au did the primary work ramping up the company's operations.  That Law and Au became the ultimate shareholders of PWCCI appears, like many other aspects of the affairs of these companies, to be attributable solely to the whim and fiat of those individuals directing the affairs of PWC and PWCCI, Law, Au and Lee.

Thus, one finds a "unity" of ownership interests between PWC and PWCCI in the sense that the shareholders of the company sought to be held liable as the alter ego, PWCCI, were each shareholders, or should be deemed shareholders, of PWC.  And if one adds to that roster the somewhat ambiguously referred to "investment" of Mr. Lee, the "unity" of ownership is even stronger.

Moreover, the Court also notes that there was substantial overlap in the management of the two corporations.  The Board of Directors for PWC consisted of Law, Lee, and Lam.  The original Board of Directors for PWCCI consisted of Lam and Lee.  Although the Objectors attempted to argue that Lee was removed from any management role for PWCCI early in its existence, documentary evidence established that Lee remained as a director until at least March 2005, and attended Board meetings for PWCCI as late as August 2005.

The fact that the parties acting on behalf of and owning the newly formed transferor entity

30

are all parties who acted on behalf of and owned the older transferor entity establishes, to the Court's satisfaction, sufficient "unity" of interest between the subject entities, and, equally significant for this analysis, "control" by the same individuals of both entities.

To that very point, the Court observes that, when seeking to apply the alter ego doctrine between sister corporations, the cases instruct that the court's focus should be whether the corporations are so organized and controlled, and their affairs are so conducted, as to make one corporation "merely an instrumentality, agency, conduit or adjunct of another". *McLouglin v. L. Bloom Sons, Inc.,* 206 Cal.App.2d 848, 851-52 (Cal. App. 1962). *See also, Las Palmas Assoc.,* 235 Cal.App.3d at 1249.

The Court finds that standard readily met here. Not only are the ownership interests and management teams for PWC and PWCCI practically identical, but the companies shared the same offices, same phone numbers, same website, same trade-name and logo, and the same employees, and each company operated in the same industry–management of commercial construction projects. Moreover, as set forth with greater particularity at section (I.)(E.)(2.), *supra*, PWC "wound down" to facilitate PWCCI's "ramp up" in business, and paid substantially all of PWCCI's start-up costs for ten months during PWCCI's first year of operations. In all of these considerations, the facts of this case bear a striking resemblance to those presented in *Baize*, 142 Cal.App.4th at 296-299. In that case, the court found that an entity ("TECLA") affiliated to a judgment debtor ("TEC") was the alter ego of the judgment debtor based on findings that the companies had common shareholders, officers and directors, as well as shared employees, shared officers and shared attorneys. *Id.* at 302-303. Moreover, and particularly pertinent here, the trial court also found that another affiliated entity ("one of the TEC entities") had claimed that it was the developer on a construction project that TECLA was developing "further suggesting that TEC considered all of its related entities to be one and the same." *Id.* at 770-71.

Accordingly, the Court finds that Claimants have demonstrated the requisite "unity of interest" between PWC and PWCCI to satisfy that prong of the alter ego test.

31

## 2.    Injustice caused by Manipulation of Corporate Form

As set forth in section (II.)(B)(2), *supra*, the Court has already found and concluded that the creation of PWCCI and the transfer of PWC's assets to PWCCI for less than fair value made it impossible for Claimants to collect on their just debts from PWC.  In this respect, the transactions between PWC and PWCCI constituted a fraud on PWC's creditors, including Claimants.

These findings are entirely consistent with a ruling that adherence to the separateness of PWC and PWCCI would work an inequitable result in this case.  *Las Palmas Assoc.,* 235 Cal.App.3d at 1250; *Pan Pacific Sash & Door Co. v. Greendale Park, Inc*., 166 Cal.App.2d 652, 658-59 (Cal. App. 1958).

For these reasons, the Court concludes that PWCCI was the alter ego of PWC.

## D.    Claimants' Standing

Objectors also assert that Claimants' attempt to assert liability against PWCCI based upon the alleged transfer of assets from PWC to PWCCI is either an action for the benefit of PWC, akin to a derivative action, which may be pursued only by PWC or its  authorized representative, or somehow "belongs" to the PWCCI Trustee.  The Court rejects these arguments.

First, Objectors offer no authority, and the Court is aware of none, that limits a creditor's right to pursue its individual claim against an entity that it believes is the successor to its debtor.  Indeed, the parties have each cited to numerous cases that set forth the requirements for liability under the successor corporation theory; and these authorities duly include as one basis for asserting successor liability the concept that the subject transaction was, in effect, a fraud on creditors.  Nothing in those cases suggests that such an action may not be pursued by an individual creditor.  *See, e.g., Higgins*, 122 Cal. at 376; *Stanford Hotel Co.*, 180 Cal. at 353.

Similarly, nothing in the Uniform Fraudulent Transfer Act, as enacted in California at Sections 3439.01 et seq. of the California Civil Code, indicates that an individual creditor would not have standing to sue to recover from a transferee an asset, or its value, transferred in fraud of creditors.  Rather, Cal. Civ. Code Section 3439.01(c)  defines "creditor" as a 'person who has a claim"; Section 3439.07(a)  ("Remedies of creditors") provides "In an action for relief against a

32

transfer or obligation under this chapter, a creditor . . . may obtain: (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim".

Second, while the standing rules change when the *transferor* files a bankruptcy, and standing to recover a fraudulent transfer of the transferor/debtor's property is funneled to a trustee to act pursuant to sections 544 or 548 of the Code as the representative of all creditors, that is not the case here. PWC has not filed bankruptcy, and no party, including the Trustee in PWCCI's bankruptcy case, is empowered to act for the creditors of PWC.

The Court therefore rejects the argument that the Claimants lack standing to pursue a successor liability theory, including under the "fraud on creditors" grounds.

### III. CONCLUSION

For all of the above-cited reasons, this Court OVERRULES the Objection. The Claim is hereby allowed.

33

COURT SERVICE LIST

Rodney A. Marraccini
Law Offices of Rodney A. Marraccini
1225 Alpine Rd. #204
Walnut Creek, CA 94596

Mark M. O'Brien
O'Brien Law Corporation
50 Lemon Avenue, Suite 29
Monrovia, CA 91016

Kenneth C. Greene
Hamrick & Evans, LLP
111 Universal Hollywood Drive, Suite 2200
Universal City, CA 91608

Reidun Stromsheim
Law Offices of Stromsheim and Assoc.
201 California St. #350
San Francisco, CA 94111

John Kendall
945 Morning Star Dr.
Sonora, CA 95370

34